In re:  Scott E. LUSTER, Debtor.

**Heptacore, Inc., Plaintiff–Appellee, Cross–Appellant,**

v.

**Scott E. Luster, Defendant–Appellant, Cross–Appellee.**

**Nos. 02–1790, 02–1792.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 2002.

Decided Nov. 1, 2002.

**782**

Before BAUER, MANION, and ROVNER, Circuit Judges.

### ORDER

Scott Luster, the debtor in Chapter 7 bankruptcy, appeals the district court's affirmation of the bankruptcy court's holding that certain of his debts were nondischargeable in bankruptcy, and Heptacore, Incorporated, the creditor, cross-appeals the district court's affirmation of the bankruptcy court's holding that certain of Luster's debts were dischargeable in bankruptcy. We affirm.

### I.

Scott Luster had a business relationship with Wayne Drury and his family. Drury was the chief financial officer of an excavating company and used Luster's services as a broker locating high-yield certificates of deposit for investment by the company. This worked out well in the 1980's, which gave Luster credibility with the Drurys. When the interest rate bonanza abated, Luster sought other ways to profit from the relationship with Drury. In 1994 he approached Drury about investing in a company he had set up called Cash Flow Management ("CFM"). Drury and other investors formed Heptacore, which was an investment holding company. Heptacore agreed to Luster's proposal that it finance CFM in the business of factoring, which involved the purchase of delinquent accounts receivable from various companies at a substantial discount and the subse-

quent attempt to collect the delinquent debts. A condition of the agreement between CFM and Heptacore was that Luster personally guarantee the repayment of all sums Heptacore loaned to CFM.

For a while the factoring business had some success; thus the relationship between the two companies went well in 1995 and early 1996. CFM paid four or five principal payments on the $500,000 credit line, and some interest payments. In the spring of 1996, however, CFM and Luster realized that a large number of invoices were not collectible. Luster says that he thought that some of the invoices were fake, and he contacted the FBI to investigate the alleged problem. In the meantime, Luster joined the board of directors of a drug testing company called Occupational Health Associates ("Occupational Health"). CFM had been factoring Occupational Health's receivables in 1995 and 1996, a practice that continued after Luster joined Occupational Health's board. Luster had also, in January 1996, started a company called Industrial Health Associates ("Industrial Health"), using funds derived from receivables that CFM factored for Occupational Health. Luster also used $80,000 of Heptacore's money as venture capital for Industrial Health, instead of using those funds for their proper purpose: factoring.

In May 1996, Luster requested that Heptacore extend $50,000 of credit for "funding needed for continued business" as to three of CFM's clients. On May 15, Heptacore sent the money and CFM immediately transferred $50,000 to Industrial Health, purchasing all the shares of Industrial Health's stock. Industrial Health then issued a check payable to Luster for $50,000. The check's notation said "payroll advance," and Luster promptly deposited the check into his personal checking account. None of the three client companies ever saw any of the $50,000. Luster

also used $5,000 of Heptacore's money intended for factoring instead to repay a loan made to CFM by Rate Search, Incorporated, which Luster owned. Heptacore maintains that it did not know of Luster's controlling interest in Industrial Health or Occupational Health during this time.

By the autumn of 1996, CFM was hemorrhaging money, which Luster attributed to the alleged purchase of phony invoices and clients' conversion of funds. Luster argued that, on Heptacore's direction, he closed down CFM, paid CFM's outstanding payables, and sent Heptacore the balance of the funding account. As part of the winding down of CFM, Luster authorized, and expended, $150,000 of Heptacore's money to pay creditors. One of those creditors included Rate Search. Heptacore's position is that it never authorized Luster to spend the $150,000 on winding down, because CFM owed Heptacore $678,000 and it knew CFM was destined for bankruptcy.

On April 11, 2000, Luster and his wife filed a voluntary, joint petition for Chapter 7 bankruptcy relief. On July 14, 2000, Heptacore filed an adversary proceeding in the United States Bankruptcy Court for the Southern District of Illinois. Heptacore alleged that discharging Luster's debt would, *inter alia*, contravene 11 U.S.C. § 523(a)(2)(A).[1]

The bankruptcy court held that Heptacore failed to show that the entirety of its series of transactions with Luster was fraudulent and thus refused to declare the full amount of Luster's debt to Heptacore nondischargeable under § 523(a)(2)(A). The bankruptcy court also held, however, that Heptacore had proven by a preponderance of the evidence that Luster committed four specific instances of fraud: (1)

the $50,000 purchase of stock in Occupational Health; (2) the $80,000 used as start-up capital for Industrial Health; (3) the $5,000 that Luster used to pay Rate Search; and (4) the $150,000 that Luster spent to wind up CFM. The bankruptcy court thus held that $285,000 of Luster's debt was nondischargeable under § 523(a)(2)(A). On appeal to the United States District Court for the Southern District of Illinois, the district court affirmed that holding.

Luster appeals, and Heptacore cross-appeals, raising three issues. First, Luster argues that the bankruptcy court erred in deciding, and the district court erred in affirming the decision, that Luster committed the four specific acts of fraud discussed above. Second, Luster contends that the bankruptcy court applied an incorrect legal standard in determining that certain of Luster's obligations to Heptacore were nondischargeable for fraud under § 523(a)(2)(A). Finally, Heptacore argues that the bankruptcy court erred in deciding that Luster's full debt of $678,000 was not nondischargeable under § 523(a)(2)(A).

## II.

The first issue on appeal is whether the bankruptcy court erred in deciding, and the district court erred in affirming the decision, that Luster committed the four specific acts of fraud discussed above. We review for clear error the bankruptcy court's determination of whether fraud existed under § 523(a)(2)(A). *Mayer v. Spanel Int'l, Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir.1995). Section 523(a)(2)(A) prohibits the discharge of debt incurred by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial

---

**1.** Section 523(a)(2)(A) provides that debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent [they] are obtained by ... false pretenses, a

false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" are nondischargeable.

condition[.]" In *In re Maurice*, 21 F.3d 767 (7th Cir.1994), this court held that, to prove nondischargeability under § 523(a)(2)(A), a creditor[2] must establish that: (1) the debtor obtained the money through a representation that was false or was made with such reckless regard for the truth as to constitute willful misrepresentation; (2) the debtor had an actual intent to defraud; and (3) the creditor actually and reasonably relied on the false representation. *Id* at 774. In *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court held that the creditor's reliance need only be justifiable, but not necessarily reasonable, thus modifying the third criterion we set forth in *Maurice*. *Id.* at 74; *see also Richeson v. Saltzman*, No. 97–3450, 1998 WL 152987, at *2 (7th Cir. Mar. 27, 1998) (unpublished) (employing the post-*Field* three-part test discussed above). The creditor must prove each of these elements by a preponderance of the evidence, and courts construe exceptions to discharge strictly against the creditor. *Matter of Bero*, 110 F.3d 462, 465 (7th Cir.1997); *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir.1992).

■ Luster argues that "Heptacore did not establish that Luster committed fraud" because Heptacore failed to "establish a false representation by a debtor who intended to defraud the plaintiff." We disagree. The direct evidence before the bankruptcy court was that Luster obtained Heptacore's money by representing that he would use it solely for factoring, that Luster instead deliberately used $285,000 of that money for his own purposes, and that Heptacore, given CFM's payment of principal and interest in 1995, was justified in relying on Luster's representation. Given that much of this $285,000 ended up financing Luster's personal interests, a reasonable fact-finder could conclude by a preponderance of the evidence that Luster's representation to Heptacore was false when he made it, and that Luster intended all along to use these funds for fraudulent purposes. Accordingly, we conclude that the bankruptcy court did not commit a clear error when it found that the four transactions involving a total of $285,000 were fraudulent, and that the district court did not err when it affirmed the bankruptcy court on this point.

We next turn to the second issue: whether the bankruptcy court applied the correct legal standard in determining the dischargeability of several of Luster's obligations to Heptacore under § 523(a)(2)(A).

Luster argues that the bankruptcy court used the wrong legal standard for a violation of § 523(a)(2)(A). The standard that the bankruptcy court used was as follows:

> In order to establish non-dischargeability under § 523(a)(2)(A), a creditor must prove: (1) that the debtor made a materially false representation; (2) that the debtor knew the representation was false when he or she made it, or the representation was made with such reckless disregard for the truth as to constitute willful misrepresentation; (3) that the debtor made the false representation with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on the false representation; and (5) that the creditor sustained damages as a proximate cause of reliance on the false representation. *In re Scarlata*, 979 F.2d 521 (7th Cir.1992) [*sic*]; and *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 ... (1995).

We reject Luster's position because the legal standard enunciated by the bank-

2. Under certain circumstances involving luxury goods, which are inapposite to this case, the burden lies with the debtor. *See generally* *Boyd Gaming Corp. v. Hall*, 228 B.R. 483, 488 (Bankr.M.D.Ga.1998) (discussing 11 U.S.C. § 523(a)(2)(A)).

ruptcy court is "substantively identical" to the three-part test applicable in this circuit. *Mayer v. Bank–One Rockford (In re Mayer)*, 173 B.R. 373, 377 (N.D.Ill.1994).

Finally, we turn to the last issue on appeal: whether the bankruptcy court erred in not deciding that Luster's full debt of $678,000 was nondischargeable under § 523(a)(2)(A). Heptacore argues on cross-appeal that "the District Court and Bankruptcy Court did not go far enough when neither court held the entire principal debt of $678,000 was nondischargeable due to [the] overall scheme to defraud which permeates the entire debt." Heptacore, relying on *Southwest Financial Bank & Trust Co. v. Stratton (In re Stratton)*, 140 B.R. 720 (Bankr.N.D.Ill.1992), argues that "[o]nce the Bankruptcy Court found some of the money of the commingled funds to be obtained by fraud, the burden should have been shifted to Luster to refute Heptacore's claim that the entire outstanding debt of $678,000.00 was not the result of fraud," and that, because Luster failed to meet that burden, the bankruptcy court should have declared the entire amount of the $678,000 debt nondischargeable.

■ We disagree for two reasons. First, assuming that this court were to find the reasoning of Southwest Financial wholly persuasive, that case would still be of no aid to Heptacore because the bankruptcy court did not hold that, once a creditor proves that one transaction was fraudulent under § 523(a)(2)(A), the debtor then has the burden of proving that each of his other transactions with the creditor was not fraudulent. Instead, Southwest Financial stands for the proposition that, once a creditor proves a *prima facie* case under § 523(a)(2)(B)[3] by a pre-

ponderance of the evidence, the burden of going forward *with evidence to refute the prima facie* case shifts to the debtor; otherwise, the debtor need not even adduce evidence. *Id.* at 724–25. Southwest Financial does not aid Heptacore because, in this case, Luster adduced evidence that he did not incur debts from Heptacore with fraudulent intent, thus meeting the evidentiary burden discussed in Southwest Financial. To wit, Luster established that, throughout 1995, CFM made interest and principal payments to Heptacore. A reasonable fact-finder could conclude from this evidence of repayments that Luster incurred at least some of his debts without fraudulent intent. *Cf. AT & T Universal Card Servs. v. McLeroy*, 237 B.R. 901, 905–06 (Bankr.N.D.Miss.1999) (inferring from, *inter alia*, the debtors' history of repayments that they had not acted with fraudulent intent under § 523(a)(2)(A)). Thus, even if we were to follow Southwest Financial, we still would have no cause to reverse.

Second, the bankruptcy court's holdings that Heptacore *had not* carried its burden of proving that every debt that Luster incurred was nondischargeable was consistent with its holding that Heptacore *had* met its burden as to certain specific debts. As the district court succinctly put it, "nowhere [does] Section 523(a) provide [that] an entire debt is rendered nondischargeable if the creditor proves one or two transactions out of a series of numerous transactions to be fraudulent." We agree with the district court that § 523(a)(2)(A) does not present the all-or-nothing rule that Heptacore advocates. Rather, under the provision, a court may find that certain debts were incurred by "false pretenses, a false representation, or actual fraud" (and thus nondischargeable) *and* that other

---

**3.** Although *Southwest Financial* deals with a different provision of § 523(a), the logic ap-

plies just as readily to § 523(a)(2)(A).

debts were not so incurred (and were therefore dischargeable). *See First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 421–25 (7th Cir.1985) (holding that certain debt transactions were nondischargeable under § 523(a)(2)(A) *and* that certain other debt transactions were dischargeable), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *cf. Ford Motor Credit Co. v. Branch*, 54 B.R. 211, 218–19 (Bankr. D.Colo.1985) (finding some transactions, but not others, nondischargeable under 11 U.S.C. § 523(a)(6)).

### III.

The bankruptcy court: (1) did not commit clear error when it concluded that Luster incurred four debt transactions by "false pretenses, a false representation, or actual fraud"; (2) applied the correct legal standard under § 523(a)(2)(A); and (3) correctly applied the burden of proof. We therefore affirm.