
**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>MARYLIN FELIPE CSIGI,<br>     Debtor. | BAP Nos. HI-23-1009-SGB<br>HI-23-1114-SGB |
| MARYLIN FELIPE CSIGI,<br>     Appellant,<br>v.<br>VILLIA PONCE, Trustee of the Filomena<br>D. Felipe Trust, Dated January 25, 2014,<br>     Appellee. | Bk. No. 21-00222<br><br>Adv. No. 21-90012<br><br>**MEMORANDUM***  |

Appeal from the United States Bankruptcy Court
for the District of Hawaii
Robert J. Faris, Chief Bankruptcy Judge, Presiding

Before: SPRAKER, GAN, and BRAND, Bankruptcy Judges.

### INTRODUCTION

Chapter 13[1] debtor Marylin Felipe Csigi appeals from a judgment
after trial in favor of Villia Ponce, as the successor trustee of the Filomena
D. Felipe Trust, dated January 25, 2014 ("Trust"). The bankruptcy court

---

\* This disposition is not appropriate for publication. Although it may be cited for
whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential
value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532.

held that Marylin[2] committed defalcation while acting as the former trustee of the Trust. The court further determined that Marylin "consciously disregarded or was willfully blind to her obligations [as trustee of the trust] and engaged in conduct that was certain to violate those obligations." The court concluded that Marylin misappropriated $858,639 from the trust, which should be excepted from her discharge under § 523(a)(4).

Marylin also appeals from an order granting Villia a fee award of $160,838.50 under Haw. Rev. St. ("HRS") § 554D-1004.

None of Marylin's arguments adequately support reversal of the judgment or the fee award. Accordingly, we AFFIRM.

## FACTS[3]

### A.    Marylin, her mother, and her siblings.

This appeal focuses on Marylin's conduct as trustee of the Trust before her mother, Filomena D. Felipe, passed away in June 2018. Marylin is one of eleven children Filomena had with her husband, who predeceased her. Villia is one of Marylin's ten siblings.

Filomena suffered a stroke in 2005, which left her disabled and in need of assistance with activities of daily living. For a number of years

---

[2] For ease of reference, we refer to Marylin and her family members by their first names. No disrespect is intended.

[3] We exercise our discretion, when appropriate, to take judicial notice of documents electronically filed in the underlying bankruptcy case and adversary proceeding. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

following her stroke, Filomena continued to live with her son Remigio Felipe in the home she owned on Kihapai street in Kailua, Hawaii ("Kihapai House"). Remigio provided her with some of the assistance she needed. By March 2013, however, some of Remigio's siblings, including Marylin, decided that Remigio was not adequately caring for Filomena. Consequently, Marylin and her cousin's wife moved Filomena out of the Kihapai House. Through the end of 2013, Filomena alternated living in the homes of Marylin and her sister Melita Domingo. However, in or around January 2014, Filomena permanently moved into Marylin's house and continued to live there for the rest of her life.

**B.     Filomena's Trust.**

Also in January 2014, Filomena had her attorney prepare a set of estate planning documents, including the Trust and a deed conveying the Kihapai House to the Trust. Her only other significant asset was a bank account with a balance of roughly $400, which also was transferred into the Trust. Filomena designated herself as "primary trustee." She designated Marylin and her eldest daughter Corazon Andres as "co-successor trustees."

Filomena was the Trust's "primary beneficiary." The Trust provided, "[a]s long as I [Filomena] shall live, I will have the exclusive right to the use and benefit of the income and the assets of this [T]rust. Upon my death, my successor trustee(s) shall take charge of the assets then remaining in this [T]rust and distribute them" according to the Trust's distribution plan.

3

The distribution plan referenced Marylin's agreement to take care of Filomena and set aside for Marylin 20% of the Trust's net proceeds. The remaining 80% was to be split evenly among Filomena's ten other children. As for management of the Trust's assets, the Trust provided that upon replacement of Filomena as trustee, the successor trustees were required to use the trust estate for Filomena's benefit for the rest of her life. The Trust further specified that the successor trustees "shall be fully authorized to make gifts from this trust to third parties or to the successor trustee(s) as individual(s) as determined in the sole discretion of the successor trustee(s)."

Also of note, in a paragraph entitled "Accounting Waived," the Trust gave the successor trustee(s) discretion to decide whether and to what extent they should prepare and deliver an accounting to the remainder beneficiaries. The Trust additionally stated: "successor trustee(s) shall not be required to make any current reports or accountings to any court nor to any beneficiaries."

Several months later, in May 2014, Filomena amended her estate plan in two respects. First, she resigned as trustee of the Trust. And second, she designated Marylin as her sole successor trustee, with Corazon named as alternate successor trustee, should Marylin decline to serve. The Trust otherwise did not change.

4

**C.     Filomena's mental condition and Marylin's knowledge of it.**

The parties submitted considerable evidence at trial as to Filomena's mental capacity between 2014 and her death in 2018. At the time she moved in with Marylin in January 2014, Filomena was 90 years old. Though she had survived the 2005 stroke, there is no dispute that the stroke had left her physically disabled. It is unclear to what extent, if any, the stroke mentally affected Filomena. Marylin testified that she spent virtually every day with Filomena between 2014 and her death in 2018. She insisted that she enjoyed her mother's company, they participated in the same activities, and she did not notice any significant mental deficit affecting her mother.

On the other hand, while they saw Filomena much less frequently, some of Marylin's sisters testified that Filomena during this time frame seemed forgetful and confused. They also stated that sometimes she would talk to herself as if she were talking to family members who were not actually present.

At trial, the principal evidence of Filomena's mental condition came from her primary care physician, Dr. Marina Badua. Though Dr. Badua did not testify at trial, the parties presented letters and notes she had written between 2013 and 2018. The parties also presented to the bankruptcy court a handful of hospital medical records from Filomena's hospital admissions in 2017 and 2018. Some of Dr. Badua's notes mention dementia; others do not.

In 2014, Dr. Badua wrote three letters commenting on Filomena's mental capacity. The letters were admitted into evidence but are not part of the record on appeal. Regardless, the bankruptcy court discussed these three letters in its post-trial findings. As the court noted, Dr. Badua first wrote on January 21, 2014, that Filomena "now is 90 years old and becoming forgetful, confused, and disoriented at this time and I feel that she is no longer mentally competent to manage her personal and financial affairs." But two days later Dr. Badua wrote in her second letter that Filomena "is oriented to time, place and person." Then, on May 8, 2014, six days before Filomena amended her estate plan to place Marylin in charge of the Trust, Dr. Badua wrote in her third letter that Filomena was "oriented to time, place and person and found to be mentally competent to make decisions on her own."

In January 2015, Dr. Badua wrote in her notes to Filomena's medical file that "S = gets confused at night," "talking to herself," and "gen alert." In April 2015, Dr. Badua wrote: "S = she has been confused[,] disoriented, getting restless, talking to herself—with visual and auditory hallucinations." For her diagnosis that day Dr. Badua wrote, "Senile Dementia w/ Psychosis."

In April 2017, Dr. Badua wrote "CC: Disorientation, Memory loss." One of her seven diagnoses that day included "Senile Dementia." In May 2017, Filomena had a six-day hospital stay. At the conclusion of her stay Dr. Badua wrote, "alert, oriented x" but also listed "Senile Dementia" again

6

among her diagnoses.[4] In April 2018, as part of an annual health assessment, Dr. Badua wrote "S = sometimes she gets confused[,] talking to herself[,] confused and disoriented."[5]

**D.    Use of Trust funds before sale of Kihapai House.**

As of the Trust's creation, the Kihapai House was the principal Trust asset. Filomena also received monthly social security payments, which ranged between $720 and $734.[6] The bank statements admitted into evidence at trial reflect receipt of these social security payments. The bank statements also show occasional deposits in irregular amounts from some other unidentified source, which totaled roughly $11,500. But there is no corroborating evidence documenting the source of these deposits.

Marylin generally testified that she and her husband personally paid

---

[4] Filomena's discharge summary notes at the conclusion of the six-day hospital stay in May 2017 refer to both "Medical delirium, in the setting of dementia" and "Dementia" as two of her eight discharge diagnoses.

[5] Filomena was hospitalized again in February 2018. The notes for that hospital stay state: "Per daughter at bedside, patient has intermittent episodes during which she would hallucinate a person and converse with them. During these episodes, patient would refuse to speak to family and refuse oral intake. Daughter states that patient was normal earlier yesterday but began refusing oral intake yesterday afternoon . . . . History is limited secondary to patient's baseline dementia." Marylin admitted that she brought her mother to the hospital and the vast majority of the time was the only family member present during her mother's hospital stays. But she denied that she ever commented to any doctor or hospital staff regarding her mother's mental condition. Nor did she recall ever hearing any medical professional refer to the term "dementia." Unlike Dr. Badua's notes, none of the hospital notes in the record refer to "senile dementia."

[6] The record includes general references to rent from the Kihapai House, but it is unclear whether the Trust received any rents after Filomena moved in with Marylin.

for expenses incurred in maintaining the Kihapai House, including utilities, but she did not include any detail in her testimony. Moreover, no documentation was submitted into evidence to corroborate the alleged personal payments for the Kihapai House, or to fix the amount of personal funds they expended. Rather, the banking records submitted by the parties show that the Kihapai House utility bills largely were funded from Filomena's social security payments.

The bank statements ranging from February 2014 through April 2016 also included copies of checks that appear to pay not only utilities but also various medical, legal, and laboratory test expenses. The bank statements and checks in the record from May 2016 and after tell a different story, as described below.

**E.    Sale of Kihapai House and use of the sale proceeds.**

Marylin and most of her siblings eventually agreed that the Kihapai House should be sold. In April 2016, acting as trustee of the Trust, Marylin signed the sale closing documents and received $873,739.00 in net sale proceeds, which she deposited into a trust account that she opened specifically for that purpose.

Marylin contends that she reimbursed herself from Filomena's bank account for groceries, healthcare, and supplies for Filomena. Prior to the sale of the house her stated reimbursements usually ranged from roughly $200 to $1,300. After receiving the sale proceeds, however, the reimbursements became more frequent and included much larger

payments to Marylin and members of her immediate and extended family. She variously described payments to other family members either as gifts or as compensation for services rendered either for Filomena's benefit or to maintain the Kihapai House before it was sold.

Marylin admitted that her financial record keeping was poor. She further acknowledged that she frequently failed to maintain legible contemporaneous records, like receipts, that would show how she spent the net sale proceeds.

As of June 21, 2018, several days before Filomena passed away, the balance from the sale proceeds in the trust account had been reduced to $42,102.69. Marylin testified that she withdrew this remaining balance from the Trust account and deposited it into a joint account she shared with her husband. According to Marylin, her own health was very poor at the time, she considered her own life at risk, and she wanted to make sure her husband had access to the remaining Trust funds in case he needed them for funeral or other expenses associated with her or Filomena's passing.

On June 30, 2018, Filomena passed away.

Subsequently, Marylin was unable to fully explain what happened to the funds she transferred to the joint account with her husband. She represented that a portion of them were used to satisfy Filomena's final expenses and to defray costs incurred for her funeral and multiple family gatherings following Filomena's passing. Additional sums evidently were paid to purchase "offerings" left at the cemetery when Marylin visited

Filomena's gravesite.

## F. The probate court proceedings.

Within a few months of Filomena's passing, Villia asked Marylin for a copy of Filomena's estate plan. In November 2018, Villia sent Marylin a letter, return receipt requested, reiterating this request. Marylin testified that she ignored the letter, claiming that she thought it was a joke.

In May 2019, Villia filed a probate court petition to compel production of a copy of the Trust and for an accounting. The court granted that petition by order entered August 26, 2019. Marylin produced a copy of the Trust and after several months an accounting. Nonetheless, the probate court entered an order on January 22, 2020, indicating that the initial accounting was insufficient. Accordingly, the probate court ordered Marylin to file an "updated, full and complete trust accounting," together with "detailed back-up records for the trust accounting" by February 20, 2020.

In February and March 2020, Marylin belatedly produced bank statements and 488 pages of her credit card records. The court issued a new order in May 2020 indicating that Marylin still had not fully complied with the prior orders directing her to fully account for the Trust's assets. Then, Villia filed a petition for declaratory relief, and to surcharge and remove Marylin as trustee. Villia asserted that Marylin had failed to account for the Trust's assets, had engaged in obvious self-dealing, and had thereby breached her fiduciary duties as trustee of the Trust.

10

The probate court agreed with Villia and entered an order in March 2021 granting the petition for declaratory relief, and to surcharge and remove Marylin as trustee ("Probate Order"). The probate court found that Marylin had: (1) failed to submit a complete trust accounting or to provide back-up records sufficient to support her accounting; (2) violated her fiduciary duties; and (3) "misappropriated and misused trust funds while serving as Trustee of the Trust, and a surcharge is necessary." The probate court assigned the matter to the court's civil trials calendar for a determination of the amount Marylin should be surcharged. The probate court also directed entry of final judgment in furtherance of its Probate Order in accordance with Hawaii Probate Rule 34(a) and Hawaii Rule of Civil Procedure 54(b).

**G.  Marylin's bankruptcy and Villia's nondischargeability action.**

Within a week of entry of the Probate Order, Marylin filed her chapter 13 bankruptcy petition. Villia responded by filing a complaint seeking a money judgment determining the amount Marylin should be surcharged as former trustee of the Trust and excepting that amount from discharge under § 523(a)(4). The complaint relied heavily on the probate court proceedings and the Probate Order. Villia alleged that Marylin never complied with the probate court's multiple orders to provide a complete accounting and never provided meaningful backup documentation in support of the accounting.

In the complaint, Villia claimed that Marylin should be held liable for

11

"at least $766,047.91," which the complaint broke down into the following amounts:

| AMOUNT | DESCRIPTION |
|---|---|
| $ 18,500.00 | Loaned to Roberto Lamug |
| $ 5,000.00 | Loaned to Edgar Felipe |
| $ 42,102.69 | Final withdrawal of Trust funds to close Trust account |
| $221,619.00 | Unsubstantiated reimbursements Marylin made directly and indirectly to herself |
| $275,000.00 | A "gift" Marylin made to herself and used to settle litigation against her immediate family and their meat distribution business, Tasty Meats |
| $187,500.00 | Excessive and improper use of Trust funds to remodel Marylin's house |
| $ 16,326.22 | Excessive and improper use of Trust funds to purchase an automobile |

Villia also sought to hold Marylin liable for attorney's fees.

In August 2022, Villia moved for summary judgment. She contended that based on the issue preclusive effect of the Probate Order, she was entitled as a matter of law to a nondischargeability judgment against Marylin. Villia sought damages totaling "at least $873,739." She calculated the damages based on the same "[i]mproper transactions of note" constituting "misused or misappropriated trust funds," listed in the complaint, except that the motion increased the improper home remodeling expenses from $187,500 to $227,500 and the improper automobile purchase expenses from $16,326.22 to $24,362.22. The summary

12

judgment motion ultimately asserted that the entire amount of net proceeds from the sale of the Kihapai House—"at least $873,739"—should be excepted from discharge as "misappropriated and inadequately accounted for."

The bankruptcy court granted in part Villia's summary judgment motion. It held that the Probate Order had issue preclusive effect that the Trust was valid, Marylin was trustee of the Trust, and "Marylin violated her fiduciary duties and misappropriated and misused trust funds while serving as Trustee of the Trust." According to the bankruptcy court, the only issues remaining for trial were the amount of Marylin's liability and whether she acted with the requisite state of mind for nondischargeability under § 523(a)(4).[7]

## H.    The nondischargeability trial and the bankruptcy court's findings.

The bankruptcy court held a four-day trial that took place in November 2022. In December 2022, the court issued its findings of fact and conclusions of law holding Marylin liable for all but $15,100 of the $873,739 in net proceeds Marylin received from the sale of the Kihapai House. According to the court, though Marylin claimed that hundreds of thousands of dollars were given out by the Trust as gifts to herself and to third parties, only $15,100 qualified as both corroborated and bona fide gifts. The court further held that Marylin's defalcation of the Kihapai

---

[7] Marylin has not challenged on appeal the bankruptcy court's order granting partial summary judgment.

House proceeds was accompanied by the requisite state of mind to render her liability for $858,639 ($873,739 less $15,100 in "verified gifts") nondischargeable under § 523(a)(4).

In the process of finding Marylin liable for the nondischargeable debt, the court made a number of observations. It acknowledged that Marylin must have used some the Kihapai House proceeds to reimburse herself for expenses she paid out of pocket for Filomena's care and subsistence. But, as the court explained, it was impossible to fix the amount of those expenses because Marylin "made no effort" to separate Filomena's living expenses from those of Marylin and her immediate family, which she also reimbursed from the Kihapai House proceeds. The court did not identify the aggregate amount of proceeds Marylin claimed to have spent on reimbursements, but at the conclusion of trial Villia variously calculated this amount as ranging roughly between $350,0000 and $400,000.

The court further found that Marylin improperly used the following additional amounts: (a) $275,000 to settle the business-related lawsuit against Marylin, her husband, and two of their children; (b) $225,000 to remodel the family's house; (c) $24,362.22 to purchase an automobile; and (d) an unspecified "substantial amount" for Las Vegas trips and other family outings and gatherings.

## I.     The judgment, the fee award, and the appeals therefrom.

On December 29, 2022, the bankruptcy court entered a judgment liquidating the Trust's claim at $858,639 and excepting it from Marylin's

discharge. Marylin timely appealed the nondischargeability judgment.

On January 12, 2023, Villia moved to recover attorney's fees and costs of $160,838.50 under HRS § 554D-1004 ("Fee Motion"). After briefing and a hearing, the bankruptcy court entered an order granting Villia's Fee Motion in full ("Fee Award"). The court then amended its nondischargeability judgment to add the Fee Award to the amount excepted from discharge, bringing the total amended nondischargeability judgment to $1,019,477.50. Marylin again timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334. We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.    Whether the bankruptcy court erred when it entered judgment against Marylin on Villia's § 523(a)(4) claim.

2.    Whether the bankruptcy court abused its discretion when in entered the Fee Award.

## STANDARDS OF REVIEW

When we hear an appeal from a nondischargeability judgment entered after trial, we review the bankruptcy court's factual findings under the clearly erroneous standard and its conclusions of law de novo. *See Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996). Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*,

15

606 F.3d 1189, 1196 (9th Cir. 2010). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). In contrast, when we consider a matter de novo, we give no deference to the bankruptcy court's ruling. *See Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

Generally, we review the bankruptcy court's Fee Award based on state law for an abuse of discretion. *See Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000). However, its interpretation of the relevant state fees statute is reviewed de novo. *See id.* The bankruptcy court abused its discretion if it applied an incorrect legal rule or its factual findings were illogical, implausible, or without support in the record. *TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

### I. APPEAL FROM NONDISCHARGEABILITY JUDGMENT.

### A. Nondischargeability under § 523(a)(4).

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Only fiduciary defalcation is at issue in this appeal. To prove that a debt arises from a nondischargeable fiduciary defalcation, a plaintiff creditor generally must establish: "1) an express trust existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *Otto v. Niles (In re Niles)*, 106 F.3d

16

1456, 1459 (9th Cir. 1997) (citation omitted), *partially abrogated on other grounds by Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013).

The Supreme Court in *Bullock* clarified that fiduciary defalcation only is nondischargeable under § 523(a)(4) if the fiduciary acts with a sufficiently culpable state of mind. *Bullock* explained that the fiduciary must act in "bad faith" or with "moral turpitude." *Bullock*, 569 U.S. at 273-74. In the alternative, *Bullock* elaborated, the fiduciary's conduct is sufficiently culpable if she knows her conduct is wrongful, or she acts in conscious disregard of (or with willful blindness to) "a substantial and unjustifiable risk that [her] conduct will turn out to violate a fiduciary duty." *Id.*

**B.    Marylin's arguments on appeal.**

**1.    Reasonableness of expenses—generally.**

Many of Marylin's arguments hinge on her claim that she reasonably used the Trust funds for Filomena's benefit. As Marylin points out, the bankruptcy court acknowledged that some amount of expense for Filomena's care and subsistence would have been a reasonable charge against the Trust estate. The court additionally remarked that acquiring a car suitable for Filomena to ride in also could have been a reasonable trust expense. Similarly, the court recognized that some expense for home improvements to make Filomena's living conditions more comfortable also could have constituted a reasonable trust expense. Marylin argues that the court erred because the reasonableness of some amount of expense

17

prevented her from forming the culpable state of mind required for a nondischargeable fiduciary defalcation per *Bullock*—at least as to those amounts reasonably expended.

Marylin insists that the court was required to assess the reasonableness of each individual expenditure from the Kihapai House proceeds. Furthermore, she contends that the court should have denied Villia's nondischargeability claim to the extent it found each individual expense reasonable. Finally, Marylin argues that it "shocks the conscience" and constitutes reversible error that the bankruptcy court did not credit Marylin for a single expense arising from her care for Filomena between 2014 and 2018.

### a.    Failure to keep records.

Marylin's arguments belie a fundamental misunderstanding of the bankruptcy court's decision. Though the court recognized the likelihood that Marylin spent some amount for the benefit of Filomena and the Trust, it specifically found that she failed to present any credible evidence that would have allowed the bankruptcy court to fix any specific amount as being spent for Filomena's or the Trust's benefit—reasonable or otherwise. As the court stated:

> It is impossible to determine how much of the [Trust's] money Marylin used for [Filomena's] living expenses, as opposed to the living expenses of Marylin and her husband and children, because Marylin never kept any record of the purposes for which she spent the money, and she made no effort to separate

18

[Filomena's] expenses from her own expenses.

Mem. Dec. (Dec. 9, 2022) at 10.

Similarly, the court found: "because Marylin failed to keep any records of her use of the trust funds, it is impossible to determine how much of these expenses are appropriate." *Id.* at 15-16. It also remarked: "Marylin's conduct [in failing to keep records of her expenditures] makes it impossible to verify the accuracy of the Final Account or to confirm that the expenditures listed in the account were proper uses of the trust's funds." *Id.* at 21.

The bankruptcy court further found that Marylin intentionally failed to keep sufficient records as part of her knowingly wrongful attempt to use all the Kihapai House proceeds for her own benefit. *Id.* at 19-20. The bankruptcy court based this finding on the totality of Marylin's conduct, behavior, and knowledge in dealing with the Kihapai House proceeds between April 2016, when the Kihapai House was sold, and June 2018, when Filomena passed away. *Id.* at 18-20. For example, the court additionally found that many of the transactions using the Kihapai House proceeds—particularly those involving the litigation settlement, the home remodel, and the car purchase—were structured in a manner most beneficial to Marylin and her immediate family and simultaneously most detrimental to the Trust's interests. The putative gift of Trust funds to settle the lawsuit against Marylin and her immediate family could have been structured as a loan. Likewise, the expenditure of Trust funds for the home

19

remodel could have been structured to give the Trust an interest in Marylin's house commensurate with the amount of Trust funds invested. And the car could have been titled in the name of the Trust rather than in the name of Marilyn's husband. But in each instance, the Trust received nothing in exchange for the funds expended. Marylin's appeal did not challenge the court's findings regarding the structure of these transactions, which evidenced her conscious disregard of her fiduciary duties and her deliberate decision to engage in conduct that was certain to violate those duties. *See id.* at 20, 29.

Marylin has done nothing on appeal to challenge the court's scienter findings, other than to assert the reasonableness of some of her expenditures. The record supports each of the bankruptcy court's findings, which were sufficient to tie Marylin's conduct to the requisite culpable state of mind.

### b. The parties' respective burdens.

Marylin argues that it was incumbent on Villia as plaintiff to demonstrate that each expenditure was not reasonably and appropriately made for Filomena's or the Trust's benefit. Marylin contends that Villia bore the burden of proof as to each expenditure because: (1) the Trust waived her obligation to account for the Trust's assets or to keep records to support any such accounting; and (2) Villia as the plaintiff in the nondischargeability action bore the burden to prove Marylin's liability.

Though the Trust had language purporting to excuse Marylin from

providing an accounting, trust law limits the effect of such provisions. As explained in the commentary accompanying the Restatement (Third) of Trusts § 83 (2007), a trust may purport to "dispense with or limit the normal requirements for submission of reports or accountings under this Section or as imposed by statute." But this does not excuse trustees from the essential duty "to maintain records in some reasonable form." Restatement (Third) of Trs. § 83, cmt. d. Thus, "[a] trustee who fails to keep proper records is liable for any loss or expense resulting from that failure." *Id.* at cmt. a(1).[8] Moreover, "[a] trustee's failure to maintain necessary books and records may also cause a court in reviewing a judicial accounting to resolve doubts against the trustee." *Id.*; *see also Maue v. Maue (In re Maue)*, 611 B.R. 367, 387 (Bankr. W.D. Wash. 2019) (stating that "where a trustee has failed to keep accurate and timely records . . . , all presumptions must be taken against the trustee in determining damages."). As similarly stated in *Wood v. Honeyman*, 169 P.2d 131, 162 (Or. 1946), trustees are "bound to keep clear and accurate accounts." And when they fail to do so "the presumptions are all against [them], obscurities and doubts being resolved adversely to [them]." *Id.* (quoting BOGERT ON TRS. AND TRUSTEES § 962).[9]

---

[8] Hawaii courts typically consider persuasive the Restatement (Third) of Trusts. *See In re Mitsuo Yoneji Revocable Tr. Dated Nov. 27, 1985 ("Mitsuo")*, 464 P.3d 892, 903 n.11 (Haw. Ct. App. 2020) (listing cases). Though none of the cases cited in *Mitsuo* specifically relied on comments a or d of the Restatement (Third) of Trusts § 83, we have no reason to doubt that Hawaii courts would find these comments persuasive.

[9] The reporter's notes accompanying comments a(1) and d to Restatement (Third) of Trusts § 83 quote extensively from *Wood*. One of the most apt passages from *Wood*

21

As for the respective evidentiary burdens of the parties, most courts following the Restatement have held that once the plaintiff has presented sufficient evidence of a breach of duty and a related loss to the trust, the burden shifts to the defendant—the trustee—to establish that her breach did not actually cause any loss. *See* Restatement (Third) of Trs. § 100 cmt. f, accompanying Reporter's Notes, and cited cases; *see also In re Niles*, 106 F.3d at 1462 (applying California law in the context of a § 523(a)(4) action and holding that the burden shifts to the fiduciary to adequately account for trust funds, "once the principal has shown that funds have been entrusted to the fiduciary and not paid over or otherwise accounted for").

Villia established that the Trust received $873,739.00 in net proceeds from the sale of the Kihapai House, that Marylin failed to adequately account for the exhaustion of those funds, and that the dissipation of the Trust's funds without adequate explanation constituted a breach of

---

observes:

> If a fiduciary can be rendered free from the duty of informing the beneficiary concerning matters of which he is entitled to know, and if he can also be made immune from liability resulting from his breach of the trust, equity has been rendered impotent. The present instance would be a humiliating example of the helplessness into which courts could be cast if a provision, placed in a trust instrument through a settlor's mistaken confidence in a trustee, could relieve the latter of a duty to account. Such a provision would be virtually a license to the trustee to convert the fund to his own use and thereby terminate the trust.

*Id.* at 164.

Marylin's fiduciary duties. At that point, it was incumbent on Marylin as the former trustee to present some credible evidence as to what happened to the sale proceeds and the reasonableness of her expenditures.

The court found not credible Marylin's testimony on the use of the sale proceeds. It further found her accounting unreliable. Indeed, Marylin repeatedly conceded that she did not know and could not verify or identify the purpose of specific payments listed in her Final Account. Multiple times during trial, Marylin commented that the Final Account was prepared at the time of the probate court litigation by her then attorney and by another professional in the attorney's office. She further testified that her involvement in its preparation was very limited. She also repeatedly rationalized her inability to verify certain amounts in the Final Account or to explain how they were derived. This testimony led the bankruptcy court to ultimately find: "Marylin's conduct makes it impossible to verify the accuracy of the Final Account or to confirm that the expenditures listed in the account were proper uses of the trust's funds." Mem. Dec. (Dec. 9, 2022) at 21. That finding was not clearly erroneous.[10]

---

[10] Marylin cites several cases that she argues suggest that each transaction must be looked at individually in the process of determining nondischargeability. *See Heptacore, Inc. v. Luster (In re Luster)*, 50 F. App'x 781, 785 (7th Cir. Nov. 1, 2002); *Maciolek v. Firer (In re Firer)*, 317 B.R. 457, 466 (Bankr. D. Conn. 2004); *Urological Grp., Ltd. v. Petersen (In re Petersen)*, 296 B.R. 766, 784 (Bankr. C.D. Ill. 2003). None of these cases help Marylin. None of them involved the circumstances presented here, where the plaintiff established that the entirety of the Trust's funds were dissipated without the trustee adequately explaining how the funds were used or the reasonableness of the alleged use. As indicated above, Marylin's argument ignores the fact that the burden

## 2. Reasonableness of expenses—specific amounts paid.

### a. Payments for utilities and for healthcare and legal services.

Marylin also directs us to multiple checks paid from the Trust account in 2014 and 2015—before the Kihapai House was sold and Marylin received the net sale proceeds. She contends these checks are concrete and detailed documentary evidence of payments made for Filomena's benefit. Marylin argues the bankruptcy court erred by not crediting against the Kihapai House proceeds the aggregate amount of these and similar checks paid to utilities, healthcare providers, and legal service providers.

The record demonstrates two problems with Marylin's argument. First, there is no evidence that Marylin paid the checks to utilities, healthcare providers, and legal service providers using her personal funds. To the contrary, the bank records presented into evidence show that these payments were made from the **Trust's** bank account. There is no documentary evidence in the record demonstrating that any of the money in the Trust's bank account consisted of personal funds from Marylin or her husband. Filomena's social security proceeds were the principal source of funds in the Trust account before the sale of the Kihapai House. Admittedly, during this period there were deposits of roughly $11,500 in non-social security funds. Once again, there is no documentary evidence as

shifted to her to reasonably explain how her use of the Trust funds benefitted Filomena or the Trust estate, which the bankruptcy court found she failed to do.

to the source of these deposits into the Trust account. Marylin did testify that she and her husband sometimes deposited personal funds into the Trust account. But she never provided any details or identified any specific deposits or payments. Thus, Marylin has not shown that the bankruptcy court erred by denying her credits for payments for utilities, healthcare, and legal services made from the Trust bank account.

Second, there is no documentary evidence tying the bills paid to the Kihapai House or to Filomena's healthcare and legal needs. The utility payments **might** have satisfied bills for the Kihapai House's utility services. If so, such payments would have benefitted the Trust by maintaining the house before its sale. But with respect to the utility payments, the record does not demonstrate that these payments were made on bills for the Kihapai House. The record does not include any utility bills identifying the Kihapai House as the service address for any identified payment. Similarly, the record generally indicates that the designated healthcare service provider payee—Dr. Badua—provided medical care for Filomena. But there is no documentary evidence directly tying the checks paid to Dr. Badua to bills for Filomena's medical care. Certainly, such payments **might** have been for Filomena's medical care, but it also is possible that such payments were for family members other than Filomena. There is simply no documentary evidence to prove that the identified payments were for Filomena's care or benefit. Rather, Marylin only presented the checks themselves. The only documentary evidence admitted at trial tying the

25

specific payments to Filomena was the post hoc Final Account, which the court found unreliable. The record amply supports the court's finding that the Final Account was not reliable. At bottom, the bankruptcy court did not clearly err when it found that there was insufficient evidence to prove that Marylin made any specific payments for the Trust's benefit from her personal funds.

### b. Payments for settlement of litigation, the home remodel, and the car.

It is undisputed that Marylin spent $275,000 of the Kihapai House proceeds to settle a lawsuit against herself and her immediate family. She also used $225,000 from the house proceeds to remodel her family's house to add four additional bedrooms and three additional bathrooms. And she spent $24,362.22 of the Trust's funds to purchase a car registered in her husband's name. The bankruptcy court ultimately held that none of these amounts could be credited as valid and reasonable Trust expenses incurred for the benefit of Filomena or the Trust estate. Marylin raises two partially overlapping arguments as to why the bankruptcy court should have credited her the amounts spent on these three transactions against any nondischargeable liability.

### i. Mental capacity and authorization of payments.

Marylin testified and argued at trial that Filomena authorized or directed the payments for the settlement and the remodel as gifts to Marylin. She alternately contends that Filomena agreed to pay for the

settlement in recognition of Marylin's promise to care for Filomena in her home for the rest of Filomena's life. Marylin argues that her testimony proved that Filomena authorized these large expenditures, and there was no conflicting evidence. But the bankruptcy court specifically found that her trial testimony on this point was not credible. *See* Mem. Dec. (Dec. 9, 2022) at 13.

The court further found either that Filomena did not actually consent to these payments or that her consent was vitiated by Filomena's lack of mental capacity at the time consent purportedly was given. Marylin insists that the bankruptcy court erred because it stated that she had exercised undue influence over her mother. Marylin contends that this violated her due process rights because Villia had not specifically argued undue influence. Alternatively, she argues that the evidence presented at trial was insufficient to demonstrate the elements for undue influence.

Marylin claims she was not reasonably notified before trial that undue influence was at issue and did not have a reasonable opportunity to address that issue at trial. This argument misses the point. The parties presented at trial substantial evidence of Filomena's competency and mental capacity, including her medical records and doctor's notes. Thus, the issue of Filomena's mental status was squarely raised and litigated. True, the bankruptcy court referenced undue influence when discussing Filomena's ability to knowingly and voluntarily authorize Marylin's use of Trust assets for her own benefit while she served as trustee. But the court

made these references within the larger context of considering the merits of Marylin's common law defenses to her patent self-dealing: whether Filomena had consented to, ratified, or otherwise released Marylin from liability for her conduct as trustee. *See* Restatement (Third) Trs. § 97 and accompanying case citations (discussing defenses of consent, ratification, and release).

As part of these defenses, the defendant-trustee bears the burden of proving that the consent, ratification, or release was freely given by a competent beneficiary—and not induced by the improper conduct of the trustee. This is "because of the strict fiduciary relationship between trustee and beneficiary." *Id.* at cmt. e. Accordingly, "a trustee who would rely on a beneficiary's consent, ratification, or release normally has the burden of showing that the beneficiary . . . was sufficiently informed to understand the character of the act or omission and was in a position to reach an informed opinion on the advisability of consenting, ratifying, or granting a release." *Id.* Equally important, a beneficiary's consent to or ratification of a breach of trust will not free the trustee from liability when the beneficiary was induced to act by fraud, duress, undue influence, or by other abuse of the fiduciary relationship—including procurement of the "beneficiary's approval of a transaction in which the trustee's personal interest is adverse to that of the beneficiary, and the release or transaction involves a bargain that is not substantively fair and reasonable." *Id.* at cmt. f; *see also* BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 941("all direct dealings between trustee

28

and beneficiary are regarded with suspicion by the court, [so] the trustee must bear the burden of proving that such dealings were conducted by him with the utmost fairness, and that full disclosure and independent advice are considered as important lights on the honesty of the transaction").

Marylin squarely put at issue Filomena's mental capacity when she argued that her mother had authorized the improvements to Marylin's house and the settlement of her immediate family's business litigation. Inherently, trustees may not make substantial payments to themselves for their own benefit without valid authorization. The testimony related to Filomena's mental capacity and her medical records were admitted into evidence to establish Filomena's ability, or inability, to validly consent to Marylin's use of the Trust proceeds for her personal benefit. Based on the evidence presented, the bankruptcy court found that Filomena's deteriorating mental capacity between 2014 and 2018 vitiated any consent Filomena purportedly gave in 2016.

Marylin places an inappropriate emphasis on the court's use of the phrase "undue influence." The court used this term generically to refer to Filomena's deteriorating mental condition and found that by the time of the self-dealing transactions in the second half of 2016, she lacked sufficient capacity for Marylin to rely on any such authorization to use the Trust assets for her personal benefit while serving as trustee. The court's ultimate reference to undue influence did not deprive Marylin of notice or the opportunity to be heard on the controlling question of Filomena's

29

authorization of Marylin's expenditures and the validity of any such authorization.

Marylin also challenges the sufficiency of the evidence supporting the court's finding that Marylin knew or had reason to know that any authorization her mother gave was of doubtful validity. As the bankruptcy court explained:

> Marylin attempts to justify many of her expenditures by claiming that Mother authorized them. But the trustee should not follow the direction of a settlor-beneficiary if there was reason to doubt the validity of the instruction or authorization. *Cloud v. U.S. [Nat'l] Bank of [Or.],* [570 P.2d 350, 355 (Or. 1977)]. Marylin knew that Mother's mental state had declined and that Mother's total dependence on Marylin gave Marylin undue influence over Mother. Even if Mother authorized some or all of the expenditures, Marylin was not entitled to rely on those instructions.

Mem. Dec. (Dec. 9, 2022) at 29 (footnote omitted).

*Cloud* is apposite. It stands for the proposition that a trustee cannot legally rely on the settlor's facially-valid authorization of a transaction involving trust assets when she has reason to know that the settlor's authorization might be invalid. *Cloud* relied on Restatement (Second) of Trusts § 226A ("§ 226A"). 570 P.2d at 354. As the *Cloud* court explained, § 226A dealt with the analogous problem of a trustee who makes a payment from trust funds or conveys trust property based on the trust's terms, but the trust turns out to be invalid. *Id.* According to both *Cloud* and § 226A, the trustee is liable for damages arising from the payment or

30

conveyance, "if, but only if, when he made such payment or conveyance he knew that the trust was invalid or had or should have had reasonable doubt as to its validity." *Id.* (quoting § 226A).[11] Marylin has not challenged the court's application of *Cloud*.

There is ample evidence in the record to support the bankruptcy court's determination that Marylin should have known better than to rely on any authorization purportedly given by Filomena for the use of Trust funds to pay for the $275,000 settlement or the $225,000 home remodel. Relying principally on the notes of Filomena's primary care physician Dr. Badua, the bankruptcy court found that Filomena's mental condition began to deteriorate no later than 2014 and was significantly impaired by no later than 2016, at the time Marylin claimed Filomena allegedly authorized the payments for the settlement and the home remodel. Mem. Dec. (December 9, 2022) at 5-7, 11, 16. Dr. Badua's notes between 2014 and 2016 sometimes refer to Filomena's senile dementia and also occasionally refer to her confusion, disorientation, or hallucinations.

Marylin contends that the bankruptcy court's findings were clearly erroneous. She points out that Dr. Badua only referred to dementia in some of her doctor's notes from this time period. Marylin further observes that

---

[11] Section 226A is consistent with the version of the Uniform Trust Code as adopted and enacted in Hawaii. See HRS § 554D-1006 ("A trustee who acts in **reasonable reliance** on the terms of the trust as expressed in the trust instrument shall not be liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." (emphasis added)).

there is nothing in Dr. Badua's notes prescribing any medication or referring Filomena to any specialists on account of her alleged diminished mental capacity. At bottom, Marylin interprets Dr. Badua's notes differently than the bankruptcy court. She claims that the notes when read carefully are more consistent with a finding that Filomena's mental condition did not significantly change between 2014 and 2016.

We simply are not persuaded by this argument. Marylin maintains that Filomena authorized the use of $500,000 in Trust funds—well over half of the net Kihapai House proceeds—to pay for Marylin's litigation settlement and the remodeling of her home. After considering the totality of the evidence, the bankruptcy court found that Filomena's authorizations were lacking and that Marylin knew or should have known that her mother did not have the mental capacity to make a valid authorization by the middle of 2016, when Marylin started spending the proceeds from the sale of the house. The court's findings were neither illogical, implausible, nor without support in the record. As of the date of the challenged disbursements, Dr. Badua's notes—especially when combined with Filomena's hospitalization records and the testimony of Marylin's siblings—were sufficient to support the bankruptcy court's mental capacity findings. Marylin simply disagrees with the inferences the court drew from the evidence and its ultimate finding. But, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

## ii.    Benefit argument and its evolution.

In the adversary proceeding, Marylin maintained that the remodel was undertaken, and the car was purchased for Filomena's benefit. On appeal, Marylin has somewhat modified her contentions regarding benefit and reasonableness. In the bankruptcy court she contended that the entirety of the remodel and the entirety of the car purchase were reasonable expenses of the Trust. On appeal, she more modestly argues that the bankruptcy court acknowledged that at least some portion of the remodel and some portion of the auto purchase benefitted Filomena and hence the court should have credited her for at least that portion of the payments as reasonable Trust expenses.

The bankruptcy court specifically found that Marylin failed to present any evidence that would enable the court to fix a specific amount paid for the remodel or for the car as reasonable Trust expenses. As set forth above, Marylin needed to prove which of her expenditures constituted reasonable expenses for the benefit of Filomena or the Trust. The record supports the bankruptcy court's finding that Marylin failed to meet this burden. Thus, we perceive no reversible error in the bankruptcy court's determination that Marylin was not entitled to any credit for any part of the $225,000 spent on the remodel or any part of the $24,362.22 spent on the car.

## 3.    Marylin's other arguments.

There are two other arguments we need to address, albeit briefly.

First, according to Marylin, the bankruptcy court committed reversible error by awarding damages after trial in excess of the amount alleged in Villia's complaint. But Marylin cites no authority to support the novel proposition that damages after trial cannot exceed specific amounts alleged in the plaintiff's complaint. Nor are we aware of any such authority. To the contrary, federal decisions generally do not limit a plaintiff's recovery after trial to the specific amounts alleged in the complaint. *See* Rutter Grp. Prac. Guide, Fed. Civ. Proc. Before Trial ¶¶ 8:715-8:718 (Calif. and 9th Cir. ed. April, 2024) (listing cases).

Finally, Marylin maintains that the court's findings regarding "verified gifts" were clearly erroneous. The bankruptcy court found that $15,100 in Trust expenditures were sufficiently corroborated to be bona fide gifts. The court treated these expenditures as "verified gifts" and credited them against the Kihapai House proceeds. According to Marylin, because the court found $15,100 in verified gifts, the bankruptcy court was obliged to similarly treat other expenditures that Marylin also alleged were gifts. She claims that the court did not identify which specific $15,100 in expenditures qualified as bona fide gifts, nor is it possible on the record presented to discern any meaningful distinction between and among all of the expenditures Marylin alleged were gifts.

Marylin's gift argument perplexes us. It is fundamentally inconsistent with the scheme of shifting burdens we discussed earlier in this decision. Regardless of how the bankruptcy court found that $15,100 in trust

expenditures were "verified gifts," the record supports the bankruptcy court's finding that the remainder of Marylin's alleged gift conveyances were insufficiently documented.

## II.    APPEAL FROM FEE AWARD.

A bankruptcy court may award nondischargeable attorney's fees against a debtor in a nondischargeability action when an award of such fees is authorized under applicable non-bankruptcy law and when the awarded fees flowed from the debtor's nondischargeable conduct. *See Kadjevich v. Kadjevich* (*In re Kadjevich)*, 220 F.3d 1016, 1021 (9th Cir. 2000) ("Because the nondischargeable fraud debt was the source of the award of attorney fees, the award likewise was nondischargeable even if it resulted from the debtor's good-faith attempt to litigate the issue of dischargeability." (citing *Cohen v. de la Cruz*, 523 U.S. 213, 218-19 (1998)); *see also Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1224 (9th Cir. 2010) (attorney's fees must flow from nondischargeable conduct). Here, the fees the bankruptcy court awarded flowed directly from Marylin's knowingly wrongful breach of her fiduciary duties to the trust. Marylin does not argue otherwise.

After prevailing at trial, Villia moved to recover her attorney's fees and costs incurred in both the nondischargeability action and in the main bankruptcy case. Villia sought to recover fees and costs totaling $160,838.50. To support her Fee Motion, Villia primarily relied on HRS § 554D-1004(a), which states:

> In a judicial proceeding involving the administration, interpretation, or validity of a trust, the court may award reasonable attorney's fees, costs, and expenses to any party to the trust who has acted in the best interest of the trust as a whole, to be paid by another party or from the trust that is the subject of the controversy.

But Villia also relied on Hawaii's common law of trusts. Citing *In re Estate of Dwight*, 681 P.2d 563, 566 (Haw. 1984), Villia asserted that she was entitled to recover all fees and costs she incurred as a result of Marylin's breach of her fiduciary duties.

In granting the Fee Motion in full, the bankruptcy court referenced both the common law and HRS § 554D-1004(a).

On appeal from the Fee Award, Marylin contends that the bankruptcy court's interpretation of HRS § 554D-1004(a) is overbroad. According to Marylin, the nondischargeability action and her underlying bankruptcy case were "post-probate collection matter[s]" that did not involve "administration, interpretation, or validity of a trust" as specified in HRS § 554D-1004(a). Therefore, she concludes that the fees Villia incurred in the nondischargeability action and in her bankruptcy case are not recoverable under HRS § 554D-1004(a).

Marylin's argument completely ignores the common law right to recover fees based on the trustee's breach of her fiduciary duties, which broadly aims "to make the trust and its beneficiaries whole" notwithstanding the trustee's breach of trust. Restatement (Third) of Trs.

36

§ 100, cmts. a, b(2). To accomplish this "make whole" goal, trust law affords courts with the discretion to award fees and costs in appropriate cases. *See id.* at cmt. b(2), and accompanying Reporter's Note (listing cases); *see also Mitsuo*, 464 P.3d at 903 & n.9 (relying in part on cmt. b(2) to the Restatement (Third) of Trusts § 100 and holding that a **beneficiary** can be surcharged for the litigation expenses incurred by the trust as a result of the beneficiary's breach of trust).

Furthermore, we agree with the bankruptcy court that HRS § 554D-1004(a) cannot reasonably be construed to limit or narrow the plaintiff's common law right to recover fees incurred as a result of the defendant's breach of her fiduciary duties. *See* HRS § 554D-106 (indicating that Hawaii's version of the Uniform Trust Code does not supplant or supersede the common law of trusts except when the Uniform Trust Code specifically so provides); *see also* Editor's Notes accompanying Unif. Tr. Code (2000) § 106 ("The Code is supplemented by the common law of trusts, including principles of equity.").

In short, Marylin's Fee Award appeal lacks merit. She has failed to present any cogent basis to reverse the Fee Award.

## CONCLUSION

For the reasons set forth above, we AFFIRM both the bankruptcy court's nondischargeability judgment and its Fee Award.